729 So.2d 146 (1999)
Casey BILLIESON, et al.
v.
CITY OF NEW ORLEANS, Housing Authority of New Orleans, C.J. Brown Public Housing Management Co., XYZ Insurance Co., and Louisiana Insurance Guaranty Asso.
No. 98-CA-1232.
Court of Appeal of Louisiana, Fourth Circuit.
March 3, 1999.
*149 Joseph M. Bruno, David S. Scalia, Bruno & Bruno, New Orleans, LA, and Suzette Peychaud-Bagneris, Fine & Associates, PLC, New Orleans, LA, and Gary J. Gambel, Molly B. Halloran, Murphy, Rogers & Sloss, New Orleans, LA, and Gibert V. Andry, IV, Jonathan B. Andry, Andry & Andry, New Orleans, LA, and Jennifer Willis, Cater & Willis, New Orleans, LA, Counsel for Plaintiffs/Appellants.
Leonard L. Young, Gregory J. McDonald, Bienvenu, Foster, Ryan & O'Bannon, New Orleans, LA, Roy J. Rodney Jr., Janis W. Lemle, John K. Etter, Rodney, Bordenave, Boykin, Bennette & Boyle, New Orleans, LA, Counsel for Defendants/Appellees.
Claude A. Greco, Hailey, McNamara, Hall, Larmann & Papale, L.L.P., Metairie, LA, Counsel for LIGA.
Court composed of Judge ROBERT J. KLEES, Judge WILLIAM H. BYRNES III, Judge STEVEN R. PLOTKIN.
PLOTKIN, Judge.
The sole issue in this appeal is whether the trial court correctly denied the plaintiffs' motion to certify a class action involving all claims filed by residents of New Orleans public housing seeking recovery of damages allegedly caused by lead ingestion. For the reasons that follow, we reverse the trial court judgment, certify the class action, and remand to the trial court for further proceedings.

I. Facts
The named plaintiffs[1] in this action are all parents and/or guardians of children below the age of six who allegedly suffered injury through the ingestion of lead as a result of the presence of lead paint in the housing developments in New Orleans. Paragraph VIII of the original petition describes the named plaintiffs as follows:
The named plaintiffs are members of a class and are representative of all those persons similarly situated who reside or have resided in public housing projects owned, operated, managed and maintained by defendants, and who, as a result of living in said public housing units, have been exposed to and/or contaminated by elevated levels of lead.
At the time of the hearing on the class certification question, the proposed class was defined by the plaintiffs as follows:
All persons who sustained damage through exposure to lead present in the following public housing developments: Iberville; Florida; Lafitte; B.W. Cooper; St. Bernard; Desire; Guste; Fischer; St. Thomas; and/or C.J. Peete/Magnolia owned by the Housing Authority of New Orleans, and who meet any one of the following criteria:
1. You have filed suit against the Housing Authority of New Orleans and/or C.J. Brown Property Management, Inc.; Public Housing and/or Ventana Property Management, Inc., Ventana Public Housing Management, Inc. and/or the City of New Orleans alleging damages from exposure to lead at any of the properties described above.
2. You have medical documentation or other evidence, or can obtain such evidence, showing harm related to lead.
3. You were six years old or younger on December 31, 1997.
Named defendants in the action include the City of New Orleans, Housing Authority of New Orleans (HANO), C.J. Brown Public Housing Management Co., Ventana Property Management, Inc., and various insurance companies (hereinafter referred to collectively as "HANO"). In their petition, the plaintiffs alleged, in pertinent part, as follows:

*150 VII.
The public housing units in the Parish of Orleans have dangerous levels of lead which pose a risk of and have caused contamination of the premises and personal injury to the occupants.
* * * * * *
XI.
For a number of years, defendants HANO and the City of New Orleans have been aware that serious hazardous, dangerous and non-apparent defects existed in the housing units that defendants were leasing to the named plaintiffs and others similarly situated.
XII.
Despite defendants' knowledge of the risk to tenants, it nonetheless offered its contaminated property as homes and thereby knowingly and intentionally caused great harm to the named plaintiffs and others similarly situated.
* * * * * *
XVIII.
The failure of defendants to remedy the lead problem in the public housing apartments constitutes a breach of the contract between HANO and each and every named plaintiff and those similarly situated.
XIX.
The failure of defendants to remedy the lead problem in their units is a beach of applicable law, regulations, and local housing codes.
XX.
The failure of defendants to remedy the lead problem in their units is a breach of a court order.
* * * * * *
XXIII.
Defendants were negligent in the following non-exclusive particulars:
a. Defendants knew or should have known of the hazardous, dangerous and non-apparent defects complained of herein and yet took no action to alleviate the health hazard;
b. Defendants breached the standard of care owed to the named plaintiffs and those similarly situated to provide its tenants with decent, safe, and sanitary dwellings;
c. Defendants violated regulations, code provisions, and laws by failing to perform repairs, renovations, and lead abatement in the housing unit.
d. Defendants concealed the presence of lead in the housing projects, specifically in the units rented to the named plaintiffs and those similarly situated.
e. Defendants contractually agreed to eliminate the lead-based paint, but breached this contract and their duty to the named plaintiffs and other similarly situated;
f. Defendants breached a court order to eliminate the lead hazard but have violated the court order to the harm of the named plaintiffs and those similarly situated; and
g. Defendants are also responsible for such other acts of negligence which may be discovered during investigation and trial of this matter.
XXIV.
The lead poisoning has caused and will cause severe health problems, a lifetime of illness, pain and suffering, loss of earning capacity, emotional distress, worry, anxiety, loss of enjoyment of life, permanently restricted achievement levels, decreased mental functioning levels, and disability, and will require extensive attendant care, annual testing, extensive future medical treatment, special education, rehabilitation and training.
Following a two-day hearing on the class certification issue, the trial court issued a judgment denying the plaintiffs' request to certify the class. In his reasons for judgment, the trial judge cited the fact that numerous individual suits by residents alleging damages caused by lead ingestion had previously been filed against HANO. The trial *151 court also cited numerous factors[2] "to be considered by the court," but failed to explain the impact of those factors on his decision to deny class certification. The trial judge concluded that "this is not the type of litigation that lends itself to a class action proceeding" and that the individual plaintiffs and defendants "would be better served by proceeding within their own individual lawsuits."
On appeal, the plaintiffs make two major arguments: (1) that the trial judge improperly considered evidence which was irrelevant to the question of class certification, and (2) that the trial judge improperly found that the elements necessary for class certification were not proven in this case.

II. Applicable law
The Louisiana Supreme Court has adopted the following definition of a "class action"
a nontraditional litigation procedure permitting a representative with typical claims to sue or defend on behalf of, and stand in judgment for, a class of similarly situated persons when the question is one of common or general interest to persons so numerous as to make it impracticable to bring them all before the court.
Ford v. Murphy Oil Co., 96-2913, 96-2917, 96-2929, p. 4 (La.9/9/97), 703 So.2d 542, 544, citing Herbert B. Newberg & Alba Conte, 1 Newberg on Class Actions, § 101, p. 1-2, 1-3 (3d d.1992). The Ford opinion describes the purpose and intent of the class action procedure as follows:
to adjudicate and obtain res judicata effect on all common issues applicable not only to the representatives who bring the action, but to all others who are "similarly situated," provided they are given adequate notice of the pending class action and do not timely exercise the option of exclusion from the class action.
Id. See also Banks v. New York Life Insurance Co., 98-0551, p. 2 (La.12/7/98), 722 So.2d 990, 1998 WL 852665; Andry v. Murphy Oil, U.S.A., Inc., 97-0793, p. 3 (La.App. 4 Cir. 4/1/98), 710 So.2d 1126, 1129, writs denied, 98-1158, 98-1178, 98-1204 (La.6/19/98), 720 So.2d 1213, 1214, writ not considered, 98-1204 (La.6/19/98), 719 So.2d 473.
The history of Louisiana's class action procedure is somewhat unusual. La C.C.P. arts. 591-597, commonly known as the Louisiana Class Action Statute, was adopted by the 1960 Louisiana Legislature; it was based on the 1937 formulation of Federal Rule of Civil Procedure 23, which governs class action procedure in federal courts. Kent A. Lambert, "Certification of Class Actions in Louisiana," 58 La. L.Rev. 1085, 1087 (1998). Six years later, in 1966, Federal Rule 23 was amended to "modernize" class action rules for federal courts. Nevertheless, the 1960 version of the Louisiana Class Action Statute remained in effect until July 7, 1997, when the class action articles were amended to introduce "several significant refinements based upon the post-1966 version of [Federal] Rule 23." Id. However, under the provisions of 1997 Louisiana Act No. 839, §3, the amended articles apply only to actions filed on or after July 10, 1997. The original petition in the instant case was filed on December 12, 1994. Accordingly, the pre-1997 Louisiana law on class actions applies in this case.
The pre-1997 Louisiana Class Action Statute provided, in pertinent part, as follows:
Art. 591 Prerequisites
A class action may be instituted when the persons constituting the class are so numerous as to make it impracticable for all of them to join or be joined as parties, and the character of the right sought to be enforced for or against the members of the class is:
Common to all members of the class; or
Secondary, in the sense that the owner of a primary right refuses to enforce it, and a member of the class thereby becomes entitled to enforce the right.
Art. 592. Representation
One or more members of a class, who will fairly insure the adequate representation *152 of all members, may sue or be sued in a class action on behalf of all members.
Interpreting the above articles, the Louisiana Supreme Court had by 1975 established the following three requirements for certification of a class action:
1. "a class so numerous that joinder is impractical" (commonly called the "numerosity" requirement);
2. "the joinder as parties to the suit of one or more parties who are (a) members of the class, and (b) so situated as to provide adequate representation for absent members of the class (commonly called the "adequacy of representation" requirement); and
3. "a `common character' between the rights of the representatives of the class and the absent members of the class (commonly called the "commonality" requirement)."
See Stevens v. Board of Trustees of Police Pension Fund, 309 So.2d 144 (La.1975); Scott v. American Tobacco Co., 98-0452, p. 3 (La.App. 4 Cir. 11/4/98), 725 So.2d 10, 1998 WL 802260.
Despite the fact that Louisiana's Class Action Statute was not officially amended to reflect the 1966 version of Federal Rule 23 until 1997, the Louisiana Supreme Court held in Stevens that Louisiana courts should consider, in addition to the above factors, the following factors established by the 1966 version of Federal Rule 23(b) when determining whether to certify a class action:
(1) The prosecution of separate actions by or against individual members of the class would create a risk of:
(A) Inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class; or
(B) Adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
(2) The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
(3) The court finds that the question of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (1) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered.
309 So.2d at 150-51. See also Banks, 98-0551 at 2. In addition to considering all the requirements of Federal Rule 23(b) listed above, the Stevens opinion directed Louisiana courts to consider the intertwined values of effectuating substantive law, judicial efficiency, and individual fairness involved in allowing class. The Louisiana Supreme Court later explained the effect of the Stevens decision as follows:
In sum, in Stevens we substantially liberalized the availability of class actions under Louisiana law by giving judges wide discretion in determining whether to allow class actions using the factors listed in Rule 23(b) and the "fairness" factors enumerated in Stevens, rather than following the legislative intent of allowing only "true" class actions.
96-2913 at p. 9, 703 So.2d at 547-48.
Because Louisiana's law, even prior to the 1997 amendments, was adapted largely from Federal Rule 23, "reference to cases that interpret the federal class action statute is appropriate where there is a lack of Louisiana jurisprudence on a particular issue." Banks, 95-0551 at 7. Generally, Louisiana trial judges are given vast discretion to determine *153 whether to certify a class. Id. A trial court decision may be reversed only if the appellate court finds an abuse of discretion in a trial court's decision concerning certification of class action. Id.

III. Consideration of evidence
First, the plaintiffs claim that trial court improperly considered evidence relevant only to liability and irrelevant to the pertinent questions of numerosity, adequacy of representation, and commonality. In his reasons for judgment, the trial judge noted that many factors other than lead can cause or contribute to the same medical problems commonly caused by lead ingestion. The court then stated as follows:
There are many factors to be considered by the court, among them are:
a. the number of children involved
b. the number of housing projects
c. the time and degree of exposure in the housing projects and in other places
d. the many sources of lead
e. the many causes of medical problems similar to those caused by lead
f. the seriousness of the medical problems that can be caused by lead
g. the extent of the lead abatement program in each housing project, and the apartments within the housing project
h. the condition of the paint in each apartment, i.e., is the lead paint encapsulated or is it chipping or flaking
i. the fact that other cases [sic] have sued private property owners where some of these children have lived for a time
j. an additional factor may be that the control of C.J. Brown (now, Ventura) covers only the period of July 1, 1991 thru [sic] September 30, 1994.
At a hearing on class certification, the only issue to be considered by the court is whether the case is one in which the class action procedural device is appropriate. Andry, 97-0793 at 3, 710 So.2d at 1129. Thus, "the court is not concerned with whether the plaintiffs have stated a cause of action or the likelihood that they ultimately will prevail on the merits." Id., citing Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) and Miller v. Mackey International, Inc., 452 F.2d 424 (5th Cir. 1971).
The transcript of the hearing on the class certification issue in this case reveals that the plaintiffs' attorney objected numerous times to the introduction of evidence he felt was irrelevant to the issues of numerosity, adequacy of representation, and commonality. On appeal, the plaintiffs point specifically to the trial court's statements "concerning other considerations such as the time and degree of exposure in the projects and other places, other sources of lead, similar medical problems caused by sources other than lead, condition of the paint, etc." They claim that none of those issues are pertinent to the class certification issues before the court. We find no merit in the plaintiffs' arguments on this issue. One of the three issues the court must consider in deciding the commonality requirement is whether "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Banks, 98-0551 at 7; Andry, 97-0793 at p. 7, 710 So.2d at 1131. Most of the factors cited by the trial judge in his reasons for judgment, including all the factors specifically singled out by the plaintiffs, are pertinent to that question because they represent questions which will be individual to each member of the class. Ultimately, the trial court was required to consider whether questions common to the members of the class predominant over the issues he listed. His reasons for judgment indicate that he found that the common issues do not predominate over individual issues.

IV. Certification of class action
Under Louisiana law, a class action may be certified only if the numerosity, adequacy of representation, and commonality requirements are present. The burden of proving the existence of all three elements falls on the party seeking to maintain the class action. Cotton v. Gaylord Container, 96-1958, p. 13 (La.App. 1 Cir. 3/27/97), 691 *154 So.2d 760, 768, writ denied, 97-0800 (La.4/8/97), 693 So.2d 147. Conclusory allegations in the pleadings are insufficient to prove these elements; however, the court may consider the pleadings, affidavits, depositions, briefs, exhibits and testimony presented at the certification hearing. Id.

A. Numerosity
The first prerequisite for maintaining a class action established by La. C.C.P. art. 591(A)(1) is that the members of the class be so numerous that joinder is impracticable; this is sometimes called the "impracticality" or "numerosity" requirement. The numerosity requirement has been explained as follows:
This requirement reflects the basic function of the class action as a device for allowing a small number of persons to protect or enforce rights or claims for the benefit of many where it would be inequitable and impracticable to join every person sharing an interest in the rights or claims at issue in the suit.
Lambert, 58 La. L.Rev. at 1114.
Generally, a class action is appropriate whenever the interested parties appear to be so numerous that separate suits would unduly burden the courts, and a class action would "clearly be more useful and judicially expedient than the other available procedures." Cotton, 96-1958, 691 So.2d at 768. Determination of whether this requirement has been fulfilled depends on the facts and circumstances of each individual case. Cotton, 96-1958 at 14, 691 So.2d at 768; Dumas v. Angus Chemical Co., 25,632 (La. App. 2 Cir. 3/30/94), 635 So.2d 446, 450, writ denied, 94-1120 (La.6/24/94), 640 So.2d 1349.
No set number of plaintiffs is required in order to fulfill this requirement. Dumas, 635 So.2d at 450. In fact, difficulty in identifying the claimants is one of the factors that makes joinder impracticable and a class action appropriate; thus, the plaintiffs are not required to identify every member of the class prior to certification. Id. The class must, however, be definable. Cotton, 96-1958 at 14, 691 So.2d at 768; Dumas, 635 So.2d at 450. See also Andry, 97-0793 at 4, 710 So.2d at 1129.
In the instant case, official HANO demographics indicated that some 4839 children between the ages of one and five resided in New Orleans housing projects owned and operated by HANO as of December 31, 1997; the proposed class definition includes only children under the age of six on that same dayDecember 31, 1997. Thus, the potential class members include the 4839 children between one and five living in HANO housing on that date, plus the number of children between the ages of five and six, which cannot be determined by the demographic information in the record.
Evidence in the record indicates that New Orleans Health Department officials inspected housing project units for the presence of lead every time a child tested positive for lead in routine screening. The Health Department "New Orleans Lead Poisoning Prevention Program Workload Statistics" in the record of this case indicate that the following numbers of HANO dwellings were identified as "lead hazardous" during the indicated years: 1992 - 55; 1993 - 49; 1994 - 40; 1995 - 78; 1996 - 50. The record indicates that young children were living in each of the dwellings identified by the Health Department as "lead hazardous."
Also presented by the plaintiffs were lead survey reports from both RBK Inc. and ATC Environmental Inc. The RBK survey reports, dated April 13 through June 29, 1998, indicated some 200 units with components which tested positive for lead. Perhaps more telling is the report of the lead survey performed by ATC Environmental, dated November 1995. That reports recorded the following results of number of units tested in each of the New Orleans housing developments which "contained lead that exceeded HUD's protocol threshold: St. Thomas - 13 of 15 units and 4 of 10 units; C.J. Peete - 13 of 13 units and 6 of 11 units; Lafitte - 13 of 13 units; Iberville - 12 of 13 units; Florida - 10 of 10 units and 3 of 6 units; St. Bernard - 4 of 12 and 9 of 12; B.W. Cooper - 6 of 13 and 11 of 11; Desire - 10 of 23; and Guste - 5 of 15 units."
*155 Moreover, the record contains a letter indicating that approximately 250 personal injury lawsuits have been filed in Civil District Court claiming damages caused by lead poisoning. The trial judge noted in his reasons for judgment that he has been assigned as a judge ad hoc for the sole purpose of hearing and disposing of some 235 cases against HANO involving allegations of lead poisoning. He also noted that other lead-in-gestion cases against HANO have not been assigned to him. Under the circumstances, the numerosity requirement is clearly met.
HANO suggests that the fact that a large number of lawsuits have already been filed on this issue indicates that a class action is not appropriate in this case because "[t]here is no unrepresented "class," given the fact more than 900 actual plaintiffs have actually filed individual lawsuits." However, that argument was previously rejected by this court in Lailhengue v. Mobile Oil Co., 94-2114 (La.App. 4 Cir. 6/7/95), 657 So.2d 542 and in Andry, 97-0793, 710 So.2d 1126. In Lailhengue, certification of the class action was approved despite the fact nine other lawsuits had previously been filed on behalf of more than 1,200 individuals; some 2,500 households were allegedly potentially involved in that case. 94-2114 at 5, 657 So.2d at 546. In Andry, this court approved class certification despite the fact that more than 1,400 persons had previously assert claims. 97-0793 at 4, 710 So.2d at 1129.
Other courts have also approved certification of class actions despite the fact that a large number of individual suits had already been filed. In McCastle v. Rollins Environmental Services, 456 So.2d 612 (La.1984), for example, the Louisiana Supreme Court approved certification of a class action despite the fact 490 plaintiffs had already been joined; in that case as in the instant case, some 4,000 potential plaintiffs were involved. 456 So.2d at 620-21. Finally, in Cotton, the court approved a class action certification despite noting that "thousands of plaintiffs [had] already filed suit." 96-1958 at 15, 691 So.2d at 769. citing Cotton, 96-1958, 691 So.2d 760. See also Livingston Parish Police Jury v. Acadiana Shipyards, 598 So.2d 1177 (La.App. 1 Cir.), writs denied 605 So.2d 1122 (La.1992).
The following finding from this court's opinion in Lailhengue applies equally to the instant case:
[]he joinder in a single proceeding of a class so large, and continuing to increase or change, would be impracticable. If not brought as a class action, the sheer number of actual or potential claims would be enough to unduly burden this Judicial District and this Court, whether the claims are brought as separate suits or by joinder.
94-2114 at 5; 657 So.2d at 546. The plaintiffs presented sufficient evidence to prove the numerosity requirement.

B. Adequacy of representation
The second prerequisite for maintaining a class action is proof of adequate representation for the absent class members. This element requires that the proposed class representatives prove that their claims are "a cross-section of, or typical of, the claims of all class members." Andry, 97-0793 at p. 6, 710 So.2d at 1130.
Citing a number of federal cases, as well as Louisiana cases, Lambert suggested the following "factors which may be relevant" to the adequacy of representation inquiry:
(1) The representative must be able to demonstrate that he or she suffered an actualvis-a-vis hypotheticalinjury;
(2) The representative should possess first hand knowledge or experience of the conduct at issue in the litigation;
(3) The representative's stake in the litigation, that is, the substantiality of his or her interest in winning the lawsuit, should be significant enough, relative to that of other class members to ensure that representative's conscientious participation in the litigation; and
(4) The representative should not have interests seriously antagonistic to or in direct conflict with those of other class members, whether because the representative is subject to unique defenses or additional claims against him or her, or where *156 the representative is seeking special or additional relief.
58 La. L.Rev. at 1117 (citations omitted).
Plaintiffs presented the expert testimony of Dr. John F. Rosen of the Albert Einstein College of Medicine/Montefiore Medical Center in Bronx, New York. Dr. Rosen chaired the committee which developed the Center for Disease Control Statement on childhood lead poisoning, lowing the level considered dangerous to any level more than 9.0 micrograms of lead per decimeter. Dr. Rosen testified to the following types of problems in children with elevated blood lead levels between 10.0 and 20.0: loss of IQ points, learning disabilities, deficits in abstract thinking, and attention deficit hyperactivity disorders. Dr. Rosen also testified to deficits in the following areas: memory, fine motor skills, information and knowledge, speed of processing new information, problem solving, general comprehension, general cognitive ability, visual perceptual skills, and organizing material. Ultimately, he said, a child will experience judgment problems, lack of organization, and antisocial behavior. Extreme cases of lead poisoning can even lead to brain swelling, coma, and death, he said.
The record in this case contains the testimony of five proposed class representativesSheila Green, Joyce Galmon, Aretha Arnold, Barbara Vincent, and Detress Lewis. All of the proposed representatives testified that they currently or previously lived in a HANO housing unit with children for whom they are responsible as parents and/or guardians. Moreover, all of the class representatives testified to elevated blood lead levels in their children, as well as behavioral problems allegedly caused by those elevated blood lead levels.
For example, Ms. Green testified that she had previously resided in the Lafitte Housing Development with her three sons for eight or nine years. All three children, she said, had been diagnosed with elevated blood lead levels while residing at Lafitte. Moreover, she testified that one of her children suffered from hyperactivity, behavioral problems, and learning disabilities. The apartment where they lived in Lafitte had peeling or cracking paint, she asserted. The record evidence indicates that her children experienced the following highest blood lead levels: Donald Green - 23, and Ronald Green - 43.
Ms. Galmon, who lived in the C.J. Peete Housing Development for eight years with her four children, also testified to elevated blood lead levels, hyperactivity, behavior problems, and speech problems experienced by her children, and said that her apartment contained peeling, cracking paint. Ms. Galmon's children experienced the following highest blood lead levels, according to the record evidence: Aaron Galmon - 25, and Delaaronia Galmon - 43. The same types of complaints were relayed by Aretha Arnold, who lived at C.J. Peete for five years with four children; Barbara Vincent, who had lived at the Florida Housing Development with her nine grandchildren; and Detress Lewis, who lived at C.J. Peete with her two children all their lives. The record indicates that their children experienced the following highest blood lead levels: Ms. Arnold: Aretha Arnold - 25.2, Shaft Arnold - 13, Arielle Arnold - 20, and Sharetha Arnold - 10.2; Ms. Vincent: Ervinisha Brady - 14, and Al Brady - 12; and Ms. Lewis: Brunika Lewis - 48, Dionte Lewis - 53, and Dionte Lewis - 44. Both Brunika Lewis and Dionte have been hospitalized for lead poisoning.
The above evidence is sufficient to meet the requirements for proving adequacy of representation. First, the proposed class representatives have demonstrated an actual injury since all of them care for children who have experienced elevated blood lead levels. Second, the proposed class representatives have demonstrated first-hand knowledge or experience of the conduct at issue, since all testified that the paint in the housing development units in which they resided was peeling and/or cracking. Third, the proposed class representatives have demonstrated a substantial stake in the litigation, since all of them have at least two children who have allegedly suffered injury as a result of HANO's alleged failure to properly abate lead paint in the housing projects of New Orleans. Fourth, no record evidence indicates that any of the proposed class representatives have interests seriously antagonistic *157 to or in direct conflict with those of other class members.
HANO claims that the plaintiffs have failed to prove adequacy of representation for three reasons: (1) the injuries suffered by the children of the proposed representatives are not "typical" of those of other children living in the housing projects, (2) the claims of the proposed representatives do not include "the full range of claims potentially asserted," and (3) the proposed representatives reside or have resided in only three of the ten housing developments in New Orleans. However, none of those arguments are sufficient to defeat class certification in this case.
First, the fact that the children of the proposed representatives suffer problems which may not be attributed to ingestion of lead does not disqualify their parents and guardians to be class representatives. The question of the exact injuries suffered by each child as a result of lead ingestion is relevant, not to the class certification issue that is the only issue before this court, but to damages.
Second, Louisiana jurisprudence interpreting the Class Action Statute does not require that the class representatives exhibit all the different types of possible injuries; it requires only that the claims of the class representatives be "a cross-section of, or typical of, the claims of all class members." In Andry, this court stated as follows:
Defendants argue that the class representatives appointed by the trial court do not have claims typical of one another, and do not correspond to claims made by other witnesses who testified. We disagree. The petitions filed assert claims for fear, fright, anxiety, property damage, and inconvenience. A thorough review of the record convinces us that the claims of the persons specified as class representatives adequately represent a cross-section of the claims made. Each appointed representative was a resident, business owner, or both, within the geographical area designated by the trial court, and is similarly situated to other claimants. The claims asserted by the class representatives include claims for evacuation, inconvenience, mental anguish and suffering, fear, anxiety, emotional distress, and economic damages for broken windows, removal of soot and debris, medical expenses, and business interruption. Although a claim by a particular class representative with regard to the exact damage claimed may not be typical, the class of damages asserted by each representative is. We, therefore, find nothing in the record to support the defendants' argument that the class representatives will not adequately represent the absent class members.
97-0793 at pp. 6-7, 710 So.2d at 1131 (citations omitted). See also Atkins v. Harcross Chemicals, Inc., 93-1904, p. 5 (La.App. 4 Cir. 5/17/94), 638 So.2d 302, 305-306, writs denied, 94-2158, 94-2161 (La.11/11/94), 644 So.2d 396.
Third, the fact that the plaintiffs have not proposed a class representative who lived in each and every one of the ten housing developments in New Orleans does not defeat the adequacy of representation requirement. HANO claims that Louisiana jurisprudence "requires the `boundaries' of the proposed class to be specifically shown by the plaintiffs, so that the class representatives can assert the claims of all absent class members." In support of this argument, they cite Becnel v. United Gas, 613 So.2d 1155 (La. App. 5 Cir.1993). We have carefully reviewed the Becnel case, seeking some language to support HANO's argument, but have found none. Moreover, the Becnel case is factually distinguishable from the instant case. Nothing in the record evidence presented in this case overcomes the plaintiff's evidence that they will be able to assert the claims of all the absent class members. Accordingly, we find that the adequacy of representation requirement has been met.

C. Commonality
The third requirement for certification of a class action is that there be "questions of law and fact common to the class." Banks, 98-551 at 7. Generally, the jurisprudence requires that the common questions predominate over the individual issues because "[c]lass actions are limited to cases in which it would achieve economics of time, *158 effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Scott, 98-0452 at p. 9. Although it is unclear from the express language, the trial court's reasons for judgmentand especially his list of factors to be consideredindicate that this was the factor that concerned him.
The "common character" requirement is perhaps best explained by the following quote from the Louisiana Supreme Court's decision in McCastle, as follows:
Lawyers for a long time have perceived that some litigious situations affecting numerous persons "naturally" or "necessarily" call for unitary adjudication. Kaplan, Continuing Work of the Civil Committee: 1966 Amendments to the Federal Rules of Civil Procedure (I), 81 Harv.L.Rev. 356, 386 (1967). Modern practice starts with the well-agreed proposition that there is no basis for a class action unless the class is so numerous as to make individual joinder impracticable, questions of law or fact exist common to the class, and the representative parties are proper champions of the class. Kaplan, supra, at 387. Fed.Rule 23(a); La.C.C.P. arts. 591-92. But something else needs to be added to make for a "natural" or "proper" class action. Kaplan, supra, at 387.
Under Louisiana practice there must be a "common character" among the rights of the representatives and the absent members of the class in order to make for a proper class action. La.C.C.P. art. 591(1). This is not merely a reappearance of the common questions threshold requirement noted above. The requirement of a "common character" restricts the class action to those cases in which it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results. Cf. Proposed Amendments to Rules of Civil Procedure for the United States District Courts, Rule 23, Advisory Committee's Note, 39 F.R.D. 69, 102-103. Its object is to identify the cases where a class action promises important advantages of economy of effort and uniformity of result without undue dilution of procedural safeguards for members of the class or for the opposing party. It invites a close look at the case before it is accepted as a class action and even then requires that it be specially treated. Cf. Kaplan, supra, at 389-390.
When a "common character" of rights exists, a class action is superior to other available adjudicatory methods for the purpose of promoting the basic aims and goals of a procedural device: (1) effectuating substantive law; (2) judicial efficiency; and (3) individual fairness. Guste v. General Motors Corp., 370 So.2d 477, 488(La.1978); Williams v. State, 350 So.2d 131, 133-34 (La.1977); Stevens v. Board of Trustees, 309 So.2d 144, 151 (La.1975). Therefore, if the superiority of a class action is disputed, the trial court must inquire into the aspects of the case and decide whether the intertwined goals of effectuating substantive law, judicial efficiency, and individual fairness would be better served by some other procedural device.
Many class action related circumstances in a particular case may contribute toward or detract from the intertwined goals. Non-exhaustive lists of some of the factors, which may appear in any given case with varying degrees of intensity, are set forth by Federal Rule 23(b) and the Uniform Class Actions Act and have been suggested for use by this court. See Stevens, supra, 309 So.2d at 150-51; Williams, supra, 50 So.2d at 134, n. 3. After identifying the listed factors and any relevant unlisted ones that may be present in the case, the trial court must evaluate, quantify and weigh them to determine to what extent the class action would in each instance promote or detract from the goals of effectuating substantive law, judicial efficiency, and individual fairness. Upon arriving at an estimate of the class action's overall effectiveness in furthering the intertwined goals, the court must compare this with its assessment of the effectiveness of other adjudicatory methods and decide whether the class action is the superior procedural device.

*159 In determining whether a class action in a particular case will promote enforcement of legislative policy, fairness and efficiency, the trial court must actively inquire into every aspect of the case and should not hesitate to require showings beyond the pleadings. Stevens, supra, 309 So.2d at 152. Once the threshold requirements have been met and a prima facia showing for a class action has been made, the court must assume primary responsibility for directing the inquiry because of the effects its decision may have upon substantive law, absentees, and the court system.
Id. at 616-18 (footnotes omitted). Thus, the "commonality" requirement involves a two-step inquiry: (1) a determination that common issues predominate over questions affecting only individual members, and (2) a determination that the class action procedure is superior to other procedural mechanisms. Lambert, 58 La. L.Rev. at 1119. See also Andry, 97-0793 at 7, 710 So.2d at 1131. The second inquiry is necessary only where, as here, the superiority of the class action procedure is disputed. McCastle, 456 So.2d at 617; Lailhengue, 94-2114 at p. 8, 657 So.2d at 547.

1. Predominance of common questions
In the instant case, the plaintiffs assert that the following issues are common to all the members of the class:
1. Whether lead exists in the HANO projects;
2. Whether the defendants were aware of the existence of the lead;
3. Whether the defendants failed to abate the lead as required by law and the consent decree which resulted from the 1971 class action certified against HANO;
4. Whether the defendants took any steps to abate the lead, and what those steps were;
5. Whether the defendants knowing of the presence of lead in the projects, and knowing of the detrimental effects of exposure to that lead, continued none the less [sic] to expose children to that danger;
6. Whether the defendants knowingly moved children into apartments containing lead;
7. When and how the defendants learned of the presence of lead in the projects;
8. Whether the defendants acted negligently;
9. Whether the defendants acted in bad faith;
10. Whether the class members have sustained injuries and damages consistent with exposure to lead;
11. Whether the class members have sustained injuries and damages as a result of the breaches of duty alleged;
12. Whether the defendants' efforts at abatement, if any, were of the type to eradicate the problem or exacerbate the problem;
13. Whether the defendant had funds available to utilize in abatement;
14. Whether there are other sources of funds available such as insurance companies, successors, subsidiaries, parent corporations, legislative funding;
15. Whether this widespread problem existing in the housing projects and which is known to be a cause of potentially serious injuries can be resolved;
16. Whether or not punitive damages are applicable in this matter;
17. Whether or not the presence of lead on the defendants' premises constitutes a defect in the premises for which the defendant may be held strictly liable.
In support of their contention that the common questions of law and fact predominate over individual issues in the instant case, the plaintiffs presented evidence to indicate that HANO's failure to deal with the lead problem in the housing projects of New Orleans was pervasive, not limited to individual cases. In other words, the plaintiffs contend that HANO consistently failed to respond in a reasonable manner to the problem, despite both an awareness of the problem and a consent decree requiring abatement.
For example, the plaintiffs presented a Audit Report of HANO prepared by the *160 United States Department of Housing and Urban Development (HUD) on June 24, 1994. That report makes numerous references both to peeling, cracking paint, and to the presence of dangerous lead-paint in HANO units. In the "Summary of Housing Quality Standards Violations" attached to that report, the following numbers of violations concerning lead paint were reported: living rooms - 48; kitchens - 64; bathrooms - 73; and other rooms - 100. Also attached was "Chart IV - Overall Average by Urgency of Need for Physical Improvements," which listed "lead base paint abatement" as one of the number seven priorities, with an urgency of need of two on a scale of one to five.
The plaintiffs also presented inspection notices, reinspection notices, and compliance notices sent to HANO by the New Orleans Health Department ordering abatement of lead-based paint found in various HANO housing units during inspections apparently prompted by the discovery of elevated blood lead levels in children residing in those units. The original inspection forms gave HANO 30 days to correct the problem; reinspection forms were sent when reinspections after 30 days revealed that the lead-paint had not been abated in the time period given. HANO received numerous reinspection notices for many of the units. Compliance forms were sent when an inspection revealed that the problem had been abated. Forms were presented for a total of 173 units. Of that number, only three revealed definitively that the problem had been corrected within 30 days, while 14 indicated that the problem was corrected by the time of the reinspection within 40 days of the original inspection notice. Otherwise, the compliance notices indicated that the problem was solved in 77 units in two to three months, while the problem was solved within four to five months in some 28 units. However, the documents indicate that the problem was not corrected in 42 of the units until at least six months after the original inspection notice. In fact, the problem was not solved in five of the apartments for more than a year, while the longest time before the problem was corrected was 16 months for one apartment and 17 months for another. Six of the records contained no compliance forms, while three were illegible. In an effort to prove that the questions of law and fact common to the parties do not predominate over the individual questions, HANO presented the expert testimony of Dr. F. William Black, a neuropsychologist at Louisiana State University and Tulane medical schools, who has conducted on-going studies of lead detection and evaluation in New Orleans. Dr. Black testified to the many different types of symptoms caused by lead ingestion, as well as the myriad causes of many of those symptoms. Dr. Black concluded that determination of the effect of an elevated blood lead level involves consideration of all medical and environmental factors, which he termed "a constellation of possible factors." Moreover, HANO presented the expert testimony of Dr. Howard W. Mielke, environment toxicologist who teaches at Xavier University and who conducted an extensive study of lead in the soil in and around New Orleans, by perpetuation deposition. Dr. Mielke testified at length concerning the prevalence of lead in the environment, and especially in the soil in New Orleans. Taken together, the testimony of Dr. Black and Dr. Mielke indicates that causation questions involving the individual also presented inspection notices, reinspection notices, and compliance notices sent to HANO by the New Orleans Health Department ordering abatement of lead-based paint found in various HANO housing units during inspections apparently prompted by the discovery of elevated blood lead levels in children residing in those units. The original inspection forms gave HANO 30 days to correct the problem; reinspection forms were sent when reinspections after 30 days revealed that the lead-paint had not been abated in the time period given. HANO received numerous reinspection notices for many of the units. Compliance forms were sent when an inspection revealed that the problem had been abated. Forms were presented for a total of 173 units. Of that number, only three revealed definitively that the problem had been corrected within 30 days, while 14 indicated that the problem was corrected by the time of the reinspection within 40 days of the original inspection notice. Otherwise, the compliance notices indicated that the problem *161 was solved in 77 units in two to three months, while the problem was solved within four to five months in some 28 units. However, the documents indicate that the problem was not corrected in 42 of the units until at least six months after the original inspection notice. In fact, the problem was not solved in five of the apartments for more than a year, while the longest time before the problem was corrected was 16 months for one apartment and 17 months for another. Six of the records contained no compliance forms, while three were illegible.
In an effort to prove that the questions of law and fact common to the parties do not predominate over the individual questions, HANO presented the expert testimony of Dr. F. William Black, a neuropsychologist at Louisiana State University and Tulane medical schools, who has conducted on-going studies of lead detection and evaluation in New Orleans. Dr. Black testified to the many different types of symptoms caused by lead ingestion, as well as the myriad causes of many of those symptoms. Dr. Black concluded that determination of the effect of an elevated blood lead level involves consideration of all medical and environmental factors, which he termed "a constellation of possible factors."
Moreover, HANO presented the expert testimony of Dr. Howard W. Mielke, environment toxicologist who teaches at Xavier University and who conducted an extensive study of lead in the soil in and around New Orleans, by perpetuation deposition. Dr. Mielke testified at length concerning the prevalence of lead in the environment, and especially in the soil in New Orleans. Taken together, the testimony of Dr. Black and Dr. Mielke indicates that causation questions involving the individual plaintiffs will vary greatly. Many of those questions were noted by the trial court in his reasons for judgment.
Nevertheless, the record as a whole reveals that the trial court abused his discretion in determining that the commonality requirement had not been proven by the plaintiffs in this case. That abuse is demonstrated by comparing the instant case to the decisions of federal courts in other cases by public housing development residents against housing authorities, where class actions have been certified. See, German v. Federal Home Loan Mortgage Corp., 885 F.Supp. 537 (S.D.N.Y.1995), clarified on reargument on other grounds, 896 F.Supp. 1385 (S.D.N.Y. 1995); Hurt v. Philadelphia Housing Authority, 151 F.R.D. 555 (E.D.Pa.1993).[3] In German, the court stated as follows:
The common questions of law generally pertain to whether defendants have failed to abide by the laws' requirements that housing owners and administrators of federal housing program funds provide and assure provision of decent, safe, and sanitary housing to the residents, in compliance with federal, state, and local housing standards....
In terms of the common law claims, there is a question as to what level of lead constitutes a danger. While certain levels have been recited in local and federal laws, the plaintiffs argue lower levels constitute harm.
There are sufficient common questions of fact and law to satisfy this requirement.
885 F.Supp. at 554.
In Hurt, the court noted that the defendants claimed, as here, "that common questions do not predominate because, among other things, plaintiffs may have differing levels of exposure to lead and individual determinations will be required as to whether [the defendant] failed to comply with local law or *162 exercise due care in specific circumstances." 151 F.R.D. at 559. Although the court referred to federal rule that one common issue is sufficient to meet the commonality requirement, the court noted eight questions of law and fact common to the members of the fact, many of which are similar to those alleged by the plaintiffs in this case. Id.
We agree with the courts deciding the German and Hurt cases that suits by residents of housing developments against housing authorities which own and operate those developments asserting damages caused by lead ingestion involve questions of law and fact common to the class which predominate over individual issues. The individual issues presented by this court are relevant primarily to the issues of damages, not to the common issues related to negligence, breach of contract, and breach of law and regulations. In some ways, this case is similar to the Louisiana Supreme Court's opinions in McCastle and Banks, as demonstrated by the following quote from Banks:
This court established in McCastle v. Rollins Environmental Services of Louisiana, Inc., 456 So.2d 612 (La.1984) that situations involving multiple or long-term incidents do not preclude class certification. In McCastle, a class action was brought against the operator of a chemical waste disposal site. The Plaintiffs alleged that the activities of the defendant between 1980 and 1981 caused them to suffer physical injuries. In McCastle, each plaintiff would be required to individually show that defendant's conduct injured them in some way. However, this court held that the plaintiffs met the "commonality" requirement because they were all injured by the same conduct. The fact that this conduct occurred for a period of one year, rather than involving one incident, did not preclude this court from certifying the class. The instant case is similar to McCastle as well. The class members in this case claim that they were all injured by the same conduct. That is, they all allege that their injuries were caused by the misrepresentations and fraudulent behavior of New York Life. Although they must prove individual injuries, they allege that their injuries were caused by the same "common" conduct. Therefore, Plaintiffs meet the commonality requirement of article 591(A)(2).
Id. at 12-13. For similar reasons as those expressed above, we find that the plaintiffs in this case have met the commonality requirement for asserting a class action.

2. Superiority of class action procedure
Determination of whether the class action procedure is the "superior procedural vehicle" under the circumstances of a given case depends upon consideration of whether the following three "intertwined goals" would be best served by use of a class action rather than some other procedural device: (1) effectuating substantive law, (2) judicial efficiency, and (3) individual fairness. McCastle, 456 So.2d at 616. That requirement was summarized by the Louisiana Supreme Court in Stevens as follows:
In determining how the legislature intended the courts to define and apply the concept of allowing a class action to enforce rights with a common character, we are mindful of the basic goals or aims of any procedural device: to implement the substantive law, and to implement that law in a manner which will provide maximum fairness to all parties with a minimum expenditure of judicial effort. Implicit, then, in decision that rights are of a common character is a consideration of the extent to which a clear legislative policy might be thwarted, or hampered in its implementation, by the lack of availability of the class action device.
But this does not end the inquiry. Fairness to the parties demands at the least that the relationship between the claims of members of the class should be examined to determine whether it would be unfair to the members of the class, or to the party opposing the class, to permit separate adjudication of the claims. In determining whether it would be unfair to require separate adjudications, for instance, the courts should consider the precedential value of the first decision, as well as the extent of injustice that will be produced by inconsistent judgments in separate actions. Another factor to be considered, for example, *163 is the size of the claims of the absent members of the class, for the greater the claim, the greater the interest of its owner in prosecuting it in a separate action.
309 So.2d at 151.
As in the McCastle case, a consideration of the pleadings in light of the appropriate pragmatic factors in this case, "indicates that a class action is superior to other procedural methods available for the fair and efficient adjudication of the controversy and the effectuation of substantive law." Id. at 618. See also, this court's opinion in Lailhengue, 94-2114, 657 So.2d 542.

a. Effectuating substantive law
The first intertwining goal for determining whether a class action is the superior procedural method for determining a given controversy is effectuating substantive law. Plaintiffs in this case have asserted causes of action on behalf of a class potentially comprised of more than 4,000 children under the age of six who have allegedly been injured by ingestion of lead-based paint in New Orleans housing developments. The causes of action are based on negligence, breach of contract, and breach of applicable law, regulations, and local housing codes.
In McCastle, the Louisiana Supreme Court cited the following two ways in which the class action serves the goal of effectuating substantive law:
First, to the extent that they open courts to claims not ordinarily litigated, class actions enable courts to enforce policies underlying causes of action in circumstances where those policies might not otherwise be effectuated. Second, to the extent that they enable courts to see the full implications of recognizing rights or remedies, class action procedures assist courts in judging precisely what outcomes of litigation would best serve the policies underlying causes of action. Class action procedures are fair because courts are more likely to see both the significance of the claims of a plaintiff and the consequences of imposing liability upon a defendant, and thus are more likely to arrive at a substantively just conclusion. Through class action procedures, moreover, the interests of absentees, who may be affected by the litigation regardless of its class nature, are given representation in the litigative process, and thus are more likely to be given their due.
456 So.2d at 618, citing "Developments in the LawClass Actions," 89 Harv.L.Rev. 1318, 1353 (1976).
Nevertheless, Louisiana courts have recognized that class actions "may tend to skew, rather than to implement faithfully, the legislative policy underlying a cause of action," in some cases. McCastle, 456 So.2d at 618; Lailhengue. 94-2114 at p. 9, 657 So.2d at 547. Thus, courts must determine whether implementation of substantive law is advanced or deterred by the class action. Lailhengue, 94-2114 at p. 9, 657 So.2d at 547. This is accomplished by "relating the pertinent circumstances of a case to these ways in which a class action may promote or distort the implementation of substantive law." McCastle, 456 So.2d at 618.
This court has previously observed as follows:
One important aspect of implementing substantive law is to enable plaintiffs to bring actions and courts to enforce policies underlying the law. Without a procedural device such as a class action, many litigants with predominantly small claims would not be able to pursue this type of claim.
In addition, class action procedures assist courts in judging precisely what outcomes of litigation would best serve the policies underlying the causes of action. Also, the class action protects the rights of absentees who are given representation in the litigative process.
However, the court must also guard against a distortion in effectuating the substantive law by the exaggerated advancement or deterrent effect or by an unfair result caused by the inappropriate maintenance of a class action.
Adams v. CSX Railroads, 615 So.2d at 482-83 (La.App. 4 Cir.1993), citing McCastle, 456 So.2d 612.
*164 The substantive policy underlying the claims made by the plaintiffs in the instant case is to require the local public housing authority to properly abate lead-based paint that was used when the buildings were constructed in the 1930's and 1940's, and to require the housing authority to pay damages for its past failure to properly abate the lead, despite HUD regulations and a consent judgment ordering it to do so. The policy behind the rules requiring lead abatement is to protect children from injuries caused by ingestion of lead. The plaintiffs in this case claim that the same children who should have been protected by HANO's compliance with the lead abatement requirements have been injured by HANO's failure to comply.
Nevertheless, the defendants claim that the fact that approximately 250 suits, involving some 900 children, have previously been filed by HANO residents demonstrates that the class action procedure would not serve the purpose of allowing the assertion of small claims which otherwise would or could not be filed. However, we have already rejected that argument. The record indicates that as many as 4,000 children in the pertinent age range lived in New Orleans housing projects as of December 31, 1997. The fact that suits involving 900 children have previously been filed does not prove that no small claims that have not been filed exist. Moreover, as noted previously, the fact that numerous individual lawsuits had previously been filed did not defeat class certification in any of the following cases: McCastle, 456 So.2d 612; Andry, 710 So.2d 1126; Cotton, 96-1958, 691 So.2d 760; Lailhengue, 94-2114, 657 So.2d 542.
Moreover, even assuming that the defendants are correct that a class action in the instant case will not serve the goal of "opening courts to claims not ordinarily litigated, thus enabling courts to enforce legislative policies underlying those causes of action," a class action will nevertheless serve the goal of "enabling courts to recognize the full implications of recognizing rights or remedies by allowing them to determine what outcome in litigation would best serve the policies underlying the causes of action." Dumas, 25,632, 635 So.2d at 452. That factor was explained in McCastle as follows:
The legislative policy underlying these causes of action operates to deter landowners' activities which cause injury and unreasonable inconvenience to others, to cause those who have profited by the activities to disgorge unjust enrichment gained thereby, and to compensate victims injured or unreasonably inconvenienced. If the claims are not asserted in a class action it is evident that many will not be pursued, that the court may not see the true significance of claims or liability, and that the court will therefore be unable to give full realization to the substantive legislative policy. On the other hand, if all claims are successfully enforced in a class action, since recovery by the victims will be limited to the amount required to compensate them fairly, there is little danger in this particular case that the legislative policy will be distorted by an exaggerated deterrent effect.
456 So.2d at 619. The same statements could be made concerning the instant case, which also involves landowners' activities with caused injuries to other, and which involves HUD policy, as opposed to Louisiana Legislative policy. We find that use of the class action procedure effectuates substantive law in this case.

b. Judicial Efficiency
The second intertwining goal for determining whether a class action is the superior procedural method for determining a given controversy is judicial efficiency. When considering this goal, courts are to be mindful that "the achievement of economies of time, effort and expense" is a fundamental objective of a class action. McCastle, 456 So.2d at 619; Dumas, 25,632, 635 So.2d at 452. As in McCastle, the difficulties which may be encountered in handling a class action in the instant case, do not outweigh the economies to be derived from unitary adjudication. 467 So.2d at 620.
Moreover, the fact that resolution of class actions sometimes places added responsibilities and burden on the trial court actually hearing the case should not be allowed to *165 overcome the fact that a class action meeting all the requisites will "facilitate a prompt, efficient, and relatively inexpensive single trial on the common nucleus of issues" as compared to hearing the cases separately. McCastle, 456 So.2d at 620. Actually, the concern about the added burdens and responsibilities placed on the judge hearing the class action does not apply in the instant case, where the trial judge actually hearing the case will have less burdens and responsibilities, not more, given the fact that he has been especially appointed an ad hoc judge to hear lead ingestion cases against HANO. He has already been assigned some 235 cases; resolution of the common issues among the plaintiffs in all those cases will actually make his job easier.
This court has previously observed as follows:
Furthermore, in promoting judicial efficiency through the use of the class action the trial court has extensive power to insure the efficient conduct of the action, and it has the power to revoke, alter or modify the certification order as later developments in the litigation necessitate. In addition, [pre-amendment] La. C.C.P. art. 593.1 provides that the trial court which certifies a class may adopt a management plan which will provide for separate trial for separate issues to be heard before separate triers of fact. This is not possible in ordinary proceedings except on consent of the parties.
Lailhengue, 94-2114 at p. 11, 657 So.2d at 548. The same conclusions apply in the instant case.
Also like Lailhengue, "while this case undeniably will present claims for damages that vary, individual questions of damages do not preclude a class action when predominant liability issues are common to the class." Id. at p. 10, 657 So.2d at 548. In the instant case, the most important issue for all the various plaintiffs will be whether HANO negligently executed its responsibility to abate lead-based paint in the housing projects. If they fail to prove that element of their cause of action, their suit fails. This issue, and all the sub-issues which are attendant to that issue involving HUD regulations and other laws, are common to all the potential plaintiffs in this case. That issue and sub-issues predominate over individual issues of causation and damages. Under the circumstances, a class action in this case promotes judicial economy.

Fairness to the parties
The third intertwining goal for determining whether a class action is the superior procedural method for determining a given controversy is "the promotion of uniformity of decision to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." McCastle, 456 So.2d at 621. Factors to be considered include the precedential value of the first decision and the extent of injustice that would result from inconsistent judgments in separate actions. Id. The fact that the amount due to each member of the class will be different is not generally a basis for disallowing a class action. See Adams, 615 So.2d 476.
The Civil District Court has chosen to adopt a unique procedural plan for deciding the myriad classes filed against HANO by housing development residents alleging injuries to children under the age of six caused by lead ingestion. A single ad hoc judge has been appointed to decide the lion's share of those cases. Because that judge will hear many different cases on the same issue, it will be humanly impossible for him to fail to develop an opinion about the question of HANO's negligence during the first few cases that he tries on the issue. That opinion will naturally color his decision in the subsequent cases, regardless of how diligently he seeks to prevent that occurrence. Thus, the cases tried by the subsequently plaintiffs will either benefit or be harmed by the earlier opinions. The effect of this inevitable fact is that the right of the absentees will not be given representation in the litigative process. Adams, 615 So.2d at 483. Fairness to all parties is much better served by allowing all potential plaintiffs to pool their resources in an effort to prove the common issues, and to allow the defendants to defend the common allegations of negligence, breach of contract, and breach of law and regulations once and for all. Because of these considerations, a class action is clearly *166 the fairest method for adjudication of these claims

V. Class definition
The defendants complain that the proposed class definition in this case is inadequate for several reasons which may be summarized as follows:
1. The definition does not allow absent class members to determine whether their right will be precluded by the litigation.
2. The definition apparently covers an unbounded time period, disregarding the one-year prescriptive period for delictual actions.
3. The definition allows persons who have been exposed to lead "present in" the housing projects, without regard to the source, form, or extent of the lead exposure.
4. The definition makes it impossible to determine whether defendants had any duty to the proposed class members.
5. The definition apparently includes people exposed to lead due to soil contamination and exposures to airborne lead from industrial sources.
6. The potential class members are impossible to fully identify.
7. The definition theoretically opens the class to people who might have sustained minimal lead exposure at a HANO development, but sustained the majority of their exposure from other sources in other locations.
8. The definition theoretically opens the class to person with claims not supported by any medical diagnosis, with no relationship to the allegedly tortious conduct of the defendants.
Moreover, the defendants complain that the plaintiffs submitted a new class definition on the morning of the class certification hearing. Because the trial court denied the motion for class certification, he failed to rule on the adequacy and propriety of the proposed definition.
Nevertheless, the defendants' arguments concerning the inadequacy of the class definition do not defeat the plaintiffs' rights to bring this case as a class action. As previously noted, La. C.C.P. art. 593.1 allows a trial court, at any time before a decision on the merits, to alter, amend or recall a certification, and to enlarge, restrict or otherwise redefine the constituency of the class or the issues to be maintained in the class action. Moreover, a study of the Louisiana class action jurisprudence reveals that appellate courts often allow certification of class actions, despite a finding that the definition is inadequate for one reason or another. See Cotton, 96-1958 at p. 15, 691 So.2d at 769; Lailhengue, 94-2114 at 12-13; 657 So.2d at 549; Livingston Parish Police Jury, 598 So.2d at 1183-84. The defendants' right to challenge the class definition on remand to the trial court is reserved.

VI. Conclusion
Despite the general rule that gives a trial judge great discretion in deciding whether class action is appropriate, "the recent jurisprudential trend is to require the trial court to grant certification when the elements have been met." Dumas, 25,632, 635 So.2d at 452, citing this court's opinions in Spitzfaden v. Dow Corning Corporation, 619 So.2d 795 (La.App. 4 Cir.), writs denied, 624 So.2d 1236, 1237 (La.1993) and Adams, 615 So.2d 476. As the Dumas court noted: "This trend is consistent with the statements made by the Louisiana Supreme Court, which direct that if there is to be an error made, it should be in favor of, and not against the maintenance of, the class action because it is always subject to modification should later developments during the course of the trial so require." 25,632, 635 So.2d at 452, citing McCastle, 456 So.2d at 620.
Accordingly, we find that the trial judge abused his discretion by denying the motion for class certification in this case because the plaintiffs presented sufficient record evidence to fulfill the statutory and jurisprudential requirements. The judgment is hereby reversed and the case is remanded for further proceedings consistent with this decision. All costs of this appeal are assessed to appellees.
REVERSED AND REMANDED.
NOTES
[1] The individual named plaintiffs are more specifically described in the section of this opinion dealing with "Adequacy of representation."
[2] For a discussion of those factors, see the section of this opinion addressing "Consideration of evidence."
[3] Another class action suit on this issue is City-Wide Coalition Against Childhood Lead Paint Poisoning v. Philadelphia Housing Authority, 356 F.Supp. 123 (E.D.Pa.1973), which resulted in a court order requiring HUD to comply with city regulations requiring removal of all lead-based paint before repainting, even if it was not chipping. A class action was also proposed in Collier v. Montgomery County Housing Authority, 97-0528, filed in the Western District court for Pennsylvania in 1998. Moreover, the proposed class action in Ledbetter v. City of Pittsburgh Housing Authority v. George Tipton, No. 96-693 (W.D.Pa.1998) settled for $1.47 million in October 1998. In Simmons v. Charleston Housing Authority, 881 F.Supp. 225 (S.D.W.V.1995), the court held that tenants stated a cause of action based on ingestion of lead pain; however, the class action issue was not addressed.