779 So.2d 1070 (2001)
John M. DUHE, Jr., et al.,
v.
TEXACO, INC. and Texaco Exploration and Production Company.
No. 99-2002.
Court of Appeal of Louisiana, Third Circuit.
February 7, 2001.
Writ Denied April 27, 2001.
*1072 William M. Hudson, III, Oats & Hudson, Andre F. Toce, Attorney at Law, Lafayette, LA, Attorney for Plaintiffs/Appellees.
David R. Dugas, Caffery, Oubre, Dugas & Campbell, Lafayette, LA, Charles S. McCowan, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Baton Rouge, LA, Robert L. Theriot, Attorney at Law, Robert Plumb, Jr., Joe B. Norman, Appeal Counsel, Liskow & Lewis, New Orleans, LA, Attorney for Defendants/Appellants-Texaco, Inc., et al.
Court composed of YELVERTON, GREMILLION, and PICKETT, Judges.
*1073 YELVERTON, J.
We have for review a judgment of April 1, 1999, of the District Court sitting in Iberia Parish certifying two consolidated actions as a class action under Louisiana Code of Civil Procedure Articles 591-597. The two defendants, Texaco, Inc., and Texaco Exploration and Production, Inc. (TEPI), appeal seeking reversal of the certification. We affirm.
The plaintiffs and proposed class representatives are John M. Duhé, Jr., Gladys Duhé Deutschle, Joseph Presto&nacute;, Mary Lynn Brignol, Ellis "Bo" Ackal, Edna Ackal Brower, Lynn Moresi Broussard, Leta Mae Broussard, Paul G. Moresi, Jr., Betty Chauvin Roden, and Pierre Broussard.
They filed two actions. The first, which bears our docket No. 99-2002, was a declaratory action. The second, which bears our docket No. 99-2003, was a suit for cancellation of leases, damages for breach of contract, and attorneys' fees. The trial court consolidated them. The trial court has indicated that should the issue of damages be reached in the class action, the remedy of cancellation of leases will be bifurcated. What is before us is whether the trial court correctly certified "Class IISelf DealingOil" as a class of Louisiana royalty payees of Texaco, Inc ., and its producing affiliate, TEPI. We will render one decision in both appeals under No. 99-2002 explaining our affirmation of this certification, and we are rendering a separate judgment today in Duhé v. Texaco, Inc., 1999-2003 (La.App. 3 Cir.2/7/01), 780 So.2d 1071.
The petitions claim that beginning March 23, 1988, Texaco and its producing affiliate, TEPI, underpaid oil royalties by valuing the amounts due the royalty owners on self-dealing, low-priced transfers of their oil from TEPI to Texaco Trading and Transportation, Inc. (TTTI), another wholly owned Texaco subsidiary. They claim that the calculation and payment of royalties was based on an internal transfer price, TTTI's posted price, instead of a better price, which they describe generally as market value, and that the TTTI posted price was less than market value. The suits are based on contract, and the class claims that Texaco breached its legal duties both under the leases and under the Louisiana Mineral Code, specifically Louisiana Revised Statute 31:122, which requires Texaco, as a mineral lessee, to operate the class members' properties as a reasonably prudent operator for their mutual benefit. Arguing that only the sale to true third-party purchasers can establish market value for royalty purposes, Wegman v. Central Transmission, Inc., 499 So.2d 436 (La.App. 2 Cir.1986), writ denied, 503 So.2d 478 (La.1987), the class representatives claim that it was reasonable for all class members to rely on Texaco to pay royalties in accordance with the legal obligations prescribed in the agreements, as governed by the Louisiana Mineral Code and related jurisprudence, i.e., payment based on fair market value in a true sale of oil to third party purchasers, and that Texaco consistently since 1988, violated its obligation to its royalty owners.
There is a stipulation in the record, following a motion to compel Texaco to produce documents, which reads as follows:
If produced, the documents requested and made subject to class representatives' motion to compel would establish that more than 50 percent of Texaco's private royalty interest owners, pursuant to the oil class definition as pled (believed by Texaco to be one-half more or less, of a total of approximately 14,000 royalty interest owners) were paid their royalty share by Texaco based upon a royalty payment code of "01". The 01 designation means to Texaco that the royalty was calculated based upon the transfer price between TTTI and TEPI for lease crude oil from March 23, 1988 to date. TEPI asserts that this transfer price between TTTI and TEPI is the sales price, and we, the Plaintiffs, disagree on that point.
*1074 Daniel Patrick Loughry, landman for Texaco, was recognized as an expert landman in relation to oil and gas interests. He testified that there were several royalty codes used by Texaco. Each established a price. The price that the "01" code established was paid to most royalty owners. In the ten years following 1988, Texaco had 6,000 or 7,000 productive private leases in Louisiana. Texaco paid some 13,000 people royalties over that period. All of the royalty owners who were coded "01" would get the TTTI posted price for every contract and every sale where the price basis was listed as TTTI's posted price. The coding was the same for ninety percent of those 13,000 royalty payees.
In short, the claims of the vast majority of the putative class is that over the time affected by this lawsuit, the royalty owners received the same price that TEPI received, and if TTTI's price that it paid TEPI was fair market value, the class representatives concede that Texaco will win the class action. If it was not fair market value, the royalty owners believe they will win the class action.
The class representatives also raise another violation of an obligation owed by Texaco. They claim that the monthly royalty statement to royalty owners, as required by the Louisiana Mineral Code, Louisiana Revised Statute 31:212.31, failed to contain the information required by law.
The record on appeal is large. Our record number 99-2002 alone consists of 65 volumes. All or most of 15 volumes contain testimony of the class representatives and experts called by both sides at the certification hearing. The rest are exhibits, including many mineral leases and division orders, and compilations of data and studies. The trial court, in ruling on objections to the admissibility of a lot of this evidence, most of which was put on by the Defendants, recognized that some of the evidence spilled over into the merits. Nevertheless, it is obvious from the numerous colloquies that took place between court and counsel during the trial of the certification hearing, that the trial court was at all times mindful of the factors dealing with certification. "In order to effectively make the Rule 23(b)(3) [our law's federal counterpart] inquiry, it is necessary for the court to consider what will have to be proved at trial and thus whether those matters can be presented by common proof or whether individual proof will be required." 7B CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1785, at 16 (1986 ed. Supp. 2000). The trial court undoubtedly considered this extraneous evidence as a means of getting a better understanding of the case and the manageability of the merits litigation if the class was certified. The certification has been thoroughly tried, and we have a complete record upon which to base our review of whether the trial court abused its discretion in deciding that this case is one in which the procedural device of a class action is appropriate.
The trial court defined the class as:
Every private (non-public) juridical person (including, but not limited to, natural persons, corporations, partnerships, trusts, limited liability corporations, joint ventures, estates, guardians, tutors, etc.):
(1) Who owned or owns royalty interest(s) in oil and condensate production from real property located in the State of Louisiana during any time from March 23, 1988, to date;
(2) Whose hydrocarbons from such properties were, and/or are, produced by Defendants, their wholly controlled entities, or affiliates, or others;
(3) Whose oil and/or condensate were, and/or are, marketed by Defendants through Texaco Trading and Transportation, Inc., (hereinafter referred to as "TTTI") and/or through any other entity wholly controlled by Defendants or their affiliates;

*1075 (4) Whose royalty for any such oil and/or condensate production from March 23, 1988, to date was calculated and/or paid by Defendants; and
(5) Whose royalty payments were reduced as the result of either: (i) prices set out in transactions between Defendants and entities wholly controlled by Defendants, or their affiliates, which prices were below "market value" (the highest prices obtainable for hydrocarbons of like kind, character, and quality, at the times of production with reasonable effort); and/or (ii) excessive charges or fees, or illicit profits retained, by Defendants, associated with transactions between them and their wholly controlled entities, or affiliates from March 23, 1988 to date.

ASSIGNMENTS OF ERROR
The Defendants assign four errors:
A. The trial court did not apply the proper law in relying upon the old standard for class certification instead of the new standard under the revised Louisiana Code of Civil Procedure articles on class actions.
B. The trial court violated the prohibition in Louisiana Code of Civil Procedure Article 592 by certifying a class after rendering a partial judgment on the merits of one of the common issues.
C. The certified class does not meet the requirements of revised Louisiana Code of Civil Procedure Article 591; in particular, it fails to meet the requirements of commonality, typicality, adequacy of representation, objectiveness of class definition, and superiority of a class procedure.
D. The trial court erred in certifying a class seeking relief under the Mineral Code because not all class representatives and absent members have made individual written demands that are a mandatory prerequisite to such litigation under Mineral Code art. 137.

ASSIGNMENT OF ERROR (A)
Texaco and TEPI contend that the trial court relied on the old standard for class certification instead of the new standard. Conceding that certification of a class is normally reviewed under the abuse of discretion standard, Banks v. New York Life Ins. Co., 98-0551 (La.7/2/99), 737 So.2d 1275, cert. denied, 528 U.S. 1158, 120 S.Ct. 1168, 145 L.Ed.2d 1078 (2000), they argue that that is not the standard for our review in this case because the trial court did not apply the proper law.
The actions filed herein were filed after July 1, 1997, and are, therefore, subject to the amendments to the Louisiana class action statute enacted by Act 839 of 1997. The trial court's reasons for judgment contained citations to McCastle v. Rollins Environmental Services, 456 So.2d 612 (La.1984). It is here that the trial court erred, say Defendants, because the predominance of common issues is the essential element for class certification, and the trial court failed to consider the requirement of predominance found in new Louisiana Code of Civil Procedure Article 591(B)(3).
We disagree. In its further reasons for judgment, the trial court recognized that "[i]n order to satisfy the common character requirement the parties seeking to certify the class must establish that questions of law or fact common to members of the class predominate over any questions affecting only individual members," which tracks the language of the 1997 amendments. During the trial, the court observed that the damage claims were filed after the effective date of the amendments.
As early as 1965, the Louisiana Supreme Court in Stevens v. Board of Trustees of Police Pension Fund, 309 So.2d 144 (La. 1975), in ascribing a meaningful definition to the test of a common character of the right sought to be enforced, found it appropriate to look to the Federal Rule 23 criteria as indicative of the guidelines for ascertaining the occasions for maintaining *1076 class actions under our own code articles. The court quoted pertinent portions of the guidelines contained in Rule 23. We note that the portion of Rule 23 quoted by the Stevens court remains the same today, and our 1997 amendments have now adopted that very language. New Article 591(A)(2) and (B)(3)(a)(b)(c) and (d) dealing with the predominance of common issues and superiority, are identical to the counterpart provisions of Rule 23.[1] The Plaintiffs in our present action sought certification under Subsection (B)(3) of the new statute by alleging the predominance of common issues of law and fact and the superiority of the class action over other methods for adjudicating the controversy.
In Banks, 737 So.2d 1275, Louisiana lower courts were reminded to continue to look to Federal Rule 23 and the federal jurisprudence, as well as our own, in making predominance and superiority determinations. To the extent that the new legislation utilizes verbatim the language of Rule 23, it provides legislative sanction of the jurisprudence and could not have been intended to change the law.
Although the 1997 legislation completely rewrote the class action provisions, the expanded provisions, according to the editor's notes following Louisiana Code of Civil Procedure Article 591, "appear to incorporate much of the jurisprudence, as set forth in McCastle v. Rollins, supra." The trial court's citation to McCastle was not a reference to outdated law. Chief Justice Calogero, in Ford v. Murphy Oil *1077 U.S.A., Inc., 96-2913, 96-2917, 96-2929 (La.9/9/97), 703 So.2d 542, 551, which was decided after the 1997 amendments (but applied the prior law), concurred "to emphasize that this Court's decision in McCastle v. Rollins Environmental Services of Louisiana, 456 So.2d 612 (La. 1984), is still good law." The trial court in the present case was aware of the applicable law and applied it correctly. We will, accordingly, review its decision under the abuse of discretion standard.

ASSIGNMENT OF ERROR (B)
The second assignment of error is that the trial court violated the prohibition in Louisiana Code of Civil Procedure Article 592 by certifying a class after rendering a partial judgment on the merits on one of the common issues. Article 592 lengthily sets out certification procedure. The Defendants' argument here is based on Article 592(A)(3)(d), which reads:
No order contemplated in this Subparagraph shall be rendered after a judgment or partial judgment on the merits of common issues has been rendered against the party opposing the class and over such party's objection.
This provision is argued to have been violated by the court's ruling, on November 3, 1998, on the Plaintiffs' "single business enterprise" claim. The trial court granted a partial summary judgment in the Plaintiffs' favor by holding that Texaco and TTTI were a "single business enterprise." The Defendants objected to this ruling. It is argued that this ruling was a partial judgment on the merits of a common issue and that certification thereafter was effectively precluded by the application of Article 592(A)(3)(d).
After reviewing the context in which the ruling was issued, and pondering the questionable effect of the ruling, we find it was not a judgment on the merits of a common issue. When the motion for partial summary judgment on the single business enterprise issue came up, it was argued that TEPI and TTTI were both wholly-owned subsidiaries of Texaco, Inc.; that TEPI owned the lease interests, operated the leases, and produced the oil which was then marketed; that TEPI had most of the leases by assignment from Texaco; and that the business of TTTI was the buying and marketing of oil. As one Texaco official put it, "Ultimately, we all work for Texaco." Everyone agreed during these arguments that fair market value meant the price at which a willing seller would sell to a willing buyer with normal market conditions at work. It was also agreed that the best evidence of fair market value of oil was sales in the field. Whether or not TEPI's sale of oil in the field to TTTI represented fair market value is an ultimate issue in the case. When this motion was decided, there was evidence in the record that the transfer price from TEPI to TTTI set the price on which the royalty was paid.
It appears that the Plaintiffs wanted a ruling declaring that TEPI and TTTI were a single business enterprise so as to eliminate the sale price between TEPI and TTTI as the sole indicium of market value. After the court indicated that it would rule that all three entities were a single business enterprise, a judgment was prepared which contained additional language holding that Texaco and TEPI were precluded from calculating or paying class members' royalties based on prices contained in transactions between TEPI and TTTI, unless those prices were independently established as representing fair market value under the leases and contracts in this case. After the Defendants objected to this additional language, it was removed by the trial court. All that was left of the judgment was a bare declaration that there was a single business enterprise. One of the attorneys for the Plaintiffs complained to the trial court that the stripped-down judgment was "a rather empty ruling." The court itself expressed uncertainty as to how the ruling would affect the Plaintiffs, but that was the judgment that the court rendered.
*1078 The phrase "judgment on the merits," partial or total, means a judgment which would have the effect of res judicata; a judgment based on legal rights as distinguished from matters of practice, procedure, jurisdiction, or form, or preliminary or merely technical points. See 23 Words and Phrases Judgment on the Merits 430 (1967 ed. 2000 Supp.). We find that the ruling did not lessen the Plaintiffs' ultimate burden of proof in the case, and did not concern the merits. It was not a judgment or partial judgment on the merits of common issues.

ASSIGNMENT OF ERROR (C)
The Defendants claim that the proposed class does not meet the requirements of new Article 591. They focus on five points: common issues do not predominate; the claims lack typicality; the class representatives are not adequate representatives; the Plaintiffs lack an objective class definition; and the class fails to meet the superiority requirement of Article 591(B)(3).
Before addressing these contentions, we deem it appropriate to state a few fundamentals by which we are guided in resolving class certification questions. One we have already mentioned: the standard of our review is abuse of discretion. We have also acknowledged our awareness that Louisiana courts have been directed by our supreme court to be guided by the state and federal jurisprudence interpreting Rule 23 and our own law. The need to advert to federal jurisprudence is even more important now that we have substantially adopted Rule 23(a). Another basic principle is that, for purposes of certification, a court is not permitted to review the claims in a case on their substantive merit. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); Billieson v. City of New Orleans, 98-1232 (La.App. 4 Cir. 3/3/99), 729 So.2d 146, writs denied, 99-0946 (La.10/29/99), 749 So.2d 644, 99-0960 (La.10/29/99), 749 So.2d 644, 645. Also, the burden is on the plaintiffs to establish that the statutory criteria for a class certification are met. Spitzfaden v. Dow Corning Corp., 619 So.2d 795 (La.App. 4 Cir.), writs denied, 624 So.2d 1236, 1237 (La.1993). With these principles in mind we will proceed to a consideration of this assignment of error.
Article 591(A) lists five prerequisites for maintaining a class action. The first four of these, like Rule 23(a), require a showing of numerosity, commonality, typicality, and adequate representation.

Numerosity
Numerosity, Article 591(A)(1), "[t]he class is so numerous that joinder of all members is impracticable," is not disputed, and we find no abuse of discretion in the trial court's finding that the numerosity element was satisfied.

Commonality
The second threshold prerequisite, Article 591(A)(2), is that "[t]here are questions of law or fact common to the class." The test of commonality is not a demanding one, and requires only that there be at least one issue, the resolution of which will affect all or a significant number of the putative class members. Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620 (5 Cir.1999), cert. denied, 528 U.S. 1159, 120 S.Ct. 1169, 145 L.Ed.2d 1078 (2000). A common question is defined as one which when answered as to one class member is answered to all of them. Forbush v. J.C. Penney Co., Inc., 994 F.2d 1101 (5 Cir.1993). The action before us arises out of a single type of contract, mineral leases. The class pleads the application of a statewide duty owed by Texaco to its royalty owners under Louisiana Revised Statute 31:122 of the Mineral Code. The class pleads that Texaco violated its duty by buying royalty owner oil under the market value leases, transferring the oil to TTTI at the posted price, and then paying royalty on the posted price when other, higher prices were obtainable with reasonable effort. They plead that Texaco violated its Mineral *1079 Code duty to all Louisiana royalty owners by failing to pay them their share of production. An additional common question is whether Texaco complied with its reporting duties under Louisiana Revised Article 31:212.31. These questions, when answered as to one class member, will be answered as to all. The commonality element is satisfied.

Typicality
Typicality, Article 591(A)(3), means that "[t]he claims or defenses of the representative parties are typical of the claims or defenses of the class." This element, simply stated another way, requires that the claims of the class representatives be a cross-section, or typical of, the claims of all class members. Cotton v. Gaylord Container, 96-1958, 96-2029, 96-2049 (La.App. 1 Cir. 3/27/97), 691 So.2d 760, writ denied, 97-0800, 97-0830 (La.4/8/97), 693 So.2d 147. "Rule 23(a)(3) [the federal counterpart] assures that the claims of the representative party are similar enough to the claims of the class so that he will adequately represent them." 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER and MARY KAY KANE, supra, § 1764, at 232-3. The test for typicality, like commonality, is not demanding. Shipes v. Trinity Industries, 987 F.2d 311 (5 Cir. 1993), cert. denied, 510 U.S. 991, 114 S.Ct. 548, 126 L.Ed.2d 450 (1993). It satisfies typicality if the representative plaintiffs' claims arise out of the same event or course of conduct as the class members' claims and are based on the same legal theory. Feinberg v. Hibernia Corp., 90-4245, 1992 WL 176119, at *5 (E.D.La. 1992).
Most of the class representatives testified at the certification hearing, one by deposition. Their check stubs in evidence showed royalty payments by Texaco, even Bo Ackel's whose interest was unleased, but he explained that Texaco had converted his 8/8ths interest into a 1/8th royalty interest and a 7/8ths working interest. All the representatives share with each other and with the absent members the same interests as royalty payees. All were paid their royalty share by Texaco based upon the royalty payment code of "01." We find no abuse of discretion in the trial court's determination that the class representatives' claims were typical of the claims of the class.

Adequate Representation
This prerequisite found in Article 591(A)(4) means that "[t]he representative parties will fairly and adequately protect the interests of the class." The trial court found that the representatives would fairly and adequately protect the interests of the class. There is no indication at all that their claims would be in anyway antagonistic to the absent members, and they demonstrated in their testimony a dedication and the ability to vigorously pursue the interests of all royalty owners.
The purpose of the adequacy requirement is to protect the legal rights of the unnamed class members. Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718 (11 Cir.1987), cert. denied, 485 U.S. 959, 108 S.Ct. 1221, 99 L.Ed.2d 421 (1988). Some of the named Plaintiffs before us are less formally educated than others. In federal law, it is not required that the named Plaintiffs understand all of the legal intricacies of the suit in order to adequately represent the class. Gibbs Properties Corp. v. CIGNA Corporation, 196 F.R.D. 430 (M.D.Fla.2000). The test often used for adequate representation consists of three elements: (1) the chosen class representatives cannot have antagonistic or conflicting claims with other members of the class; (2) the named representatives must have a sufficient interest in the outcome to insure vigorous advocacy; and (3) counsel for the named plaintiffs must be competent, experienced, qualified, and generally able to conduct the proposed litigation vigorously. Davis v. Cash For Payday, Inc., 193 F.R.D. 518 (N.D.Ill.2000). In the case before us, the evidence supports the trial court's finding that the class representatives meet the adequacy requirement. The *1080 appellants do not dispute the adequacy of counsel.

Objectiveness of Class Definition
The Defendants contend that the Plaintiffs lack an objective class definition. New Article 591(A) adds a fifth prerequisite not found in Federal Rule 23(a). It is:
(5) The class is or may be defined objectively in terms of ascertainable criteria, such that the court may determine the constituency of the class for purposes of the conclusiveness of any judgment that may be rendered in the case.
This requirement is recognized in federal cases as an essential requirement. "Although not specifically mentioned in the rule, an essential prerequisite of an action under Rule 23 is that there must be a `class'." 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, supra, § 1760, at 115. See also Kent A. Lambert, Certification of Class Actions in Louisiana, 58 La. L.Rev. 1085 (1998). "The class need not be so clearly defined that every class member can be identified at the commencement of the action." Ashe v. Board of Elections in City of New York, 124 F.R.D. 45, 47 (E.D.N.Y.1989). The trial court can modify the class as needed when discovery or the trial adds relevant facts to the record. This flexibility appears in the language of Article 591(A)(5) (emphasis supplied) "[T]he class is or may be defined...."
Texaco contends that this class definition is invalid because determining who is a member cannot be done until the ultimate issue of liability is determined on the merits. This same argument was rejected in Mullen, 186 F.3d 620. If class members are linked by a common complaint, "the possibility that some may fail to prevail on their individual claims will not defeat class membership." Id. at 624, n. 1(quoting Forbush, 994 F.2d at 1105).
In the stipulation quoted earlier in this opinion, Texaco referenced "the oil class definition as pled" as those coded "01." The trial court used the pleadings to define the class. Present Article 592(A)(3)(c), much like its predecessor, Article 593.1(B), provides that either in the process of class certification or at anytime thereafter before a decision on the merits of the common issues, the court may alter, amend, or recall its initial ruling on certification and may enlarge, restrict, or otherwise redefine the constituency of the class or the issues to be maintained in the class action. We do not find that the definition lacks objectivity, but because of a trial court's authority to redefine the class before a decision on the merits of the common issues, appellate courts often allow certification despite a finding that the definition is inadequate for one reason or another. Billieson, 729 So.2d 146. Because it is not necessary, we will not attempt to redefine the class at this stage.

Predominance and Superiority
The most forceful attack on the certification, and the most evidence elicited at trial, had to do with predominance and superiority. Article 591(A)(2) requires that there be questions of law or fact common to the class; Article 591(B)(3) (which is one of the four alternative categories of class suits provided for in Subsection (B), and the category invoked by the representatives in this case) requires a finding that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.
Texaco and TEPI argue that these are contract cases and that each royalty owner has a different lease, each affected by other relevant contracts such as division orders, all of which must be examined in order to determine the royalty obligation to each royalty owner. Therefore, they claim that, as to each royalty owner, individual questions have to be asked and answered as to Texaco's obligation to pay and at what price; what price Texaco actually *1081 paid; whether Texaco paid at the contract price or at some different price; and what were the individual damages should it be found that Texaco underpaid. Texaco argues that the royalty clauses in its thousands of leases varied greatly and that its obligation to pay royalty varied commensurately, not only because of the disparity in the royalty clauses in the leases, but also because of the existence of division orders and other contracts affecting the interpretation of each lease. It argues that the differences in pricing terms further complicate the individual issues. In addition, argues Texaco, these differences are accentuated because the prices from field to field and time to time differed, and differed also because of the quality of the oil sold. Finally, the appellants believe that the variety of remedies available under the Mineral Code renders the matter unsuitable for class treatment because it will be necessary, in the event of liability, for individual determinations to be made by the claimants as to what remedy each desires.
Based on these differences, the appellants argue that questions affecting only individual members predominate over common questions and that, consequently, class certification was improper. The class representatives respond that there are questions of fact and law common to all class members and that those questions predominate over any possible individual issues relating to quantum, damages, relief, and/or defenses.
Although McCastle, 456 So.2d 612, was a mass tort and the present case is based on contract, the same basic class action rules are applicable to our case, as evidenced by the court's premising of its discussion of the law upon the earlier cases of State ex rel Guste v. General Motors Corp., 370 So.2d 477 (La.1978) (on rehearing 1979); Williams v. State, 350 So.2d 131 (La.1977); and Stevens v. Board of Trustees, 309 So.2d 144 (La.1975). We quote from McCastle, 456 So.2d at 616 (footnotes omitted):
Under Louisiana practice there must be a "common character" among the rights of the representatives and the absent members of the class in order to make for a proper class action. La. C.C.P. art. 591(1). This is not merely a reappearance of the common questions threshold requirement noted above. The requirement of a "common character" restricts the class action to those cases in which it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results. Cf. Proposed Amendments to Rules of Civil Procedure for the United States District Courts, Rule 23, Advisory Committee's Note, 39 F.R.D. 69, 102-103. Its object is to identify the cases where a class action promises important advantages of economy of effort and uniformity of result without undue dilution of procedural safeguards for members of the class or for the opposing party. It invites a close look at the case before it is accepted as a class action and even then requires that it be specifically treated. Cf. Kaplan, supra, at 389-390.
When a "common character" of rights exists, a class action is superior to other available adjudicatory methods for the purpose of promoting the basic aims and goals of a procedural device: (1) effectuating substantive law; (2) judicial efficiency; and (3) individual fairness. State ex rel. Guste v. General Motors Corp., 370 So.2d 477, 488 (La.1978); Williams v. State, 350 So.2d 131, 133-34 (La.1977); Stevens v. Board of Trustees, 309 So.2d 144, 151 (La.1975). Therefore, if the superiority of a class action is disputed, the trial court must inquire into the aspects of the case and decide whether the intertwined goals of effectuating substantive law, judicial efficiency, and individual fairness would be better served by some other procedural device.

*1082 Many class action related circumstances in a particular case may contribute toward or detract from the intertwined goals. Non-exhaustive lists of some of the factors, which may appear in any given case with varying degrees of intensity, are set forth by Federal Rule 23(b) and the Uniform Class Actions Act and have been suggested for use by this court. See Stevens, supra, 309 So.2d at 150-51; Williams, supra, 350 So.2d at 134, n. 3. After identifying the listed factors and any relevant unlisted ones that may be present in the case, the trial court must evaluate, quantify and weigh them to determine to what extent the class action would in each instance promote or detract from the goals of effectuating substantive law, judicial efficiency, and individual fairness. Upon arriving at an estimate of the class action's overall effectiveness in furthering the intertwined goals, the court must compare this with its assessment of the effectiveness of other adjudicatory methods and decide whether the class action is the superior procedural device.
Whereas our supreme court has previously suggested use of the factors set forth in Rule 23(b), the 1997 amendments have now codified those factors as pertinent. In the federal system:
"[T]he common questions need not be dispositive of the entire action. In other words, `predominate' should not be automatically equated with `determinative' or `significant.' Therefore, when one or more of the central issues in the action are common to the class and can be said to predominate, the action will be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately."
7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, supra § 1778, at 528-9.
The factual basis for this class action is the allegation that, since 1988, some 13,000 or 14,000 royalty owners under mineral leases on Louisiana immovable property operated by Texaco or its wholly owned affiliates were underpaid their royalties. The representatives claim that the underpayment was systemic, through one common course of conduct, giving rise to a common nucleus of operative facts. This allegedly was the calculation and payment of royalties over this period of time to these numbers based on an internal transfer price (TTTI's posted price) when Texaco knew these royalty payees were entitled to market value, and that the TTTI posted price was less than market value. The class representatives claim that Texaco breached both its lease obligations and its legal duties under the Louisiana Mineral Code. Louisiana Revised Statute 31:122 recognizes the implied obligation to market diligently the minerals discovered and capable of production in paying quantities in a manner of a reasonable, prudent operator. The Louisiana Supreme Court in Frey v. Amoco Production Co., 603 So.2d 166 (La.1992), interpreted Louisiana Revised Statute 31:122 to mean that a lessee has the duty, as a reasonably prudent operator, to obtain the best price reasonably possible for oil produced on the lease. "Encompassed within the lessee's duty to market diligently is the obligation to obtain the best price reasonably possible." Id. at 175. The lessee may not receive a higher percentage of the gross revenues generated from the leased property than that delineated by the mineral contract. Id.
Whether Texaco complied with its duty is a central, core question which is obviously common to most royalty payees under Texaco's leases across the state. The coding of the great majority of the royalty owners into the "01" code to receive a royalty payment calculated on the price received by TEPI clearly creates an issue common to these coded individuals as to whether their price was the best price reasonably available. Texaco's expert, law professor Bruce Krammer, agreed that Louisiana Revised Statute 31:122 applies *1083 to regulate Texaco's royalty payments under every lease. Neil Stampe, who was qualified as an expert in the determination of the fair market value of oil, testified that, if what Texaco paid its royalty owners was less than market value, all of the royalty owners were similarly disadvantaged.
Robert J. Daigle, an expert in crude oil gathering and marketing, testified for the Defendants. He was familiar with buying South Louisiana sweet crude. He did not know how Texaco determined the value of the oil at the lease for the purpose of paying royalty. He did know how to buy oil at the leases. He said that Texaco and other oil companies would have known the market value of oil at their leases because the producers were very price conscious. He stated that, somewhere around 1990, after Iraq invaded Kuwait, it became routine for purchasers of crude oil at the lease in Louisiana to pay a premium over the posting. A sampling in evidence showed the premium was from $1.01 a barrel up to $2.00 a barrel. The variation would depend on the location of the lease, the quality of the oil, and all the other numerous factors that went into pricing. Stampe also testified that the active competing markets in Louisiana for sweet crude provided generally higher prices than TTTI's posted price. He said that the transfer price between TEPI and TTTI varied from field to field and from time to time based on a number of different criteria, but the basis for the price was uniform and uniformly applied. He explained that the methodology for achieving the price was the same across the state though the result of that methodology varied from field to field.
Lowery testified that there were roughly 6,000 active leases, and 34 to 40 separate royalty clauses among the form leases, with 94 separate royalty clauses among the non-form leases, or a total of 137 royalty clauses. Professor Krammer's testimony told of different pricing provisions among the royalty clauses, the effective division orders, the field where the evaluation of the oil would have to be measured, the quality, or gravity differences between the oil, and a whole multitude of permutations resulting from the intermix of different contracts. His testimony suggested that, as between Texaco and every royalty owner, there existed a contract so unique that there were no others like it, removing any possibility of there being common ground for determining whether Texaco had violated its contractual obligation.
However, this testimony is belied by the evidence that every coded payment by Texaco has already taken into consideration the contract variables applicable to each royalty owner. Apparently, the trial court believed that the differences in lease and royalty clause language, as affected by division orders and other contract instruments, may not create any substantial difficulty in the trial of the case as a class action. At least since 1992, with the enactment of Louisiana Revised Statute 31:138.1 by Act 1110, § 1, and perhaps earlier, a division order may not alter or amend the terms of the oil and gas lease. Frey, 603 So.2d 166. What will probably be more difficult will be the effect of differences in pricing from field to field, time to time, and quality to quality. However, these complexities would likely appear in the defenses that would almost certainly be raised by the Defendants in every case if the claims were not tried as a class, but individually. Also, it will not be necessary in the management of the class trial, that the litigants catalog every price, everywhere, on every sale, every day, throughout the state for the period of time covered by this lawsuit. Surely, a representative sampling mechanism can be devised that will be both manageable and reliable in the ascertainment of the facts. If, indeed, the Defendants underpaid royalties in the manner alleged for any time period, the fact should be objectively provable and proof as to the representatives' samplings *1084 will be proof as to the claims of the putative class.
In Louisiana an action by mineral and royalty owners of undivided fractional interests against a mineral lessee to recover damages for breach of contract of a lease is a right of a common character appropriate for a class. Williams v. Humble Oil & Refining Co., 234 F.Supp. 985 (E.D.La.1964). In Lewis v. Texaco Exploration and Prod. Co., 96-1458 (La.App. 1 Cir. 7/30/97), 698 So.2d 1001, the defendant argued that certification was improper on the ground that the plaintiffs' claims arose from separate mineral leases with the defendant, written on different forms and having different royalty provisions. The court of appeal affirmed the certification finding that the common thread that ran through each and every class member's claim was the same as that addressed in Frey, 603 So.2d 166, namely, the right to share in the proceeds of the gas contracts settlement. It found that Texaco's liability, if any, would arise from the same obligation as that owed to all the royalty owners, by application of Frye and Louisiana Revised Statute 31:122. It found that the common issues of liability predominated over the individual issues of damages and any individual defenses that might be asserted by Texaco. In Lewis there was only one field. Although the present class action will be more complex and difficult to administer than Lewis because there are many fields, common issues of liability predominate.
The Defendants argue the application of Stoute v. Wagner & Brown, 93-1207 (La. App. 1 Cir. 5/20/94), 637 So.2d 1199, writ denied, 94-1665 (La.10/7/94); 644 So.2d 638, where the court affirmed a trial court judgment refusing to certify a class action in mineral royalty litigation. The facts of Stoute are clearly distinguishable from the facts of the present case. In Stoute, there were numerous defendants. In this case, there are two nominal defendants but in effect only one. In Stoute, numerous suits had already been filed and most of the potential claimants had already retained counsel other than class counsel. There is no evidence that there have been any suits filed by any royalty owners in Louisiana against Texaco and TEPI other than the consolidated cases before us.
In Handley v. Santa Fe Minerals, Inc., 1992 OK CIV APP 149, 849 P.2d 433 (1992), an Oklahoma court of appeal affirmed a certification of a statewide class of royalty owners, where the essence of the defendant's argument was that each lease constituted a separate and dissimilar contract, different enough in substance to defeat commonality and predominance. While it recognized variations, the court found that the consistency of the royalty clauses justified the finding that the claims of all the parties were typical and that no conflict would arise between the parties.
The Defendants argue the persuasiveness of Amoco Production Co. v. Hardy, 628 S.W.2d 813 (Tex.App.Corpus Christi 1981). The court determined that the trial court had abused its discretion in certifying a class, concluding that because each contract would have to be examined to determine if there was a royalty deficiency in that contract, there were no questions common to the class. We note that in the opinion there was no reference to a statutory standard in Texas that uniformly governed and established both the right of the plaintiff class and the corresponding obligation of the defendants, leaving the differing terms of the leases the only relevant considerations. The threshold question of common issues was found lacking.
In our present case, Texaco's alleged conduct, statewide, is not going to be measured merely by its obligations under the individual leases, royalty clauses, and division orders. The overriding common issue is whether its Louisiana Revised Statute 31:122 duty has been honored or breached. The common issue that predominates is not so much what each royalty owner was entitled to receive, but the standard according to which Texaco was *1085 obliged to pay. Therefore the differences in the individual contracts, while relevant to damages, are not so much relevant to liability. This is so, because whether the royalty owners were entitled to variations such as "prevailing market price," "best market price obtainable," "average price," "price received," "amount realized," "highest price paid," "posted market price," "average posted price," "highest posted price," "prevailing posted price," or "current market value" is not the ultimate question. The claimants believe they can prove that Texaco's payment on the basis of TTTI's posted price was routinely less than any of these variations. The resolution of whether Texaco undervalued its royalty owners' oil by paying on its subsidiary's low posted price will resolve all class members' claims who were entitled to a market value payment, but received TTTI's posted price instead. This alleged conduct was homogeneous, and that is the entirety of the case. Once that question is answered, the rest is detail, and not even very complicated detail, according to the testimony of Stampe, who stated that the determination of damages could be formulated. The same records that now exist for the monthly check writing to royalty owners will be the predicate for the formulation of damages. The management of damages assessment, if liability is found, might lie simply in the broad discretion of a trial court's authority under Louisiana Civil Code Article 1999. The mere fact that varying degrees of damages may result from the same factual transaction and same legal relationship or that class members must individually prove their right to recover, does not preclude class certification. Bartlett v. Browning-Ferris Industries Chemical Services, Inc., 99-494 (La.11/12/99), 759 So.2d 755.
As part of their argument that individual issues predominate, the Defendants referred to their defense of prescription of three years provided for actions to recover underpayments of royalties from the production of minerals by Louisiana Civil Code Article 3494(5). Defendants contend that ten or eleven years of damages will necessarily be restricted to three, on the face of the pleadings, unless the individual members of the class each carries his burden of proving contra non valentem.
This potential complexity is speculative at this stage. As we have observed earlier, in determining the propriety of a class action, under federal law, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met. Miller v. Mackey International, Inc., 452 F.2d 424 (5 Cir.1971). However, on the face of the pleadings, the claim of no class member is prescribed for three years back from the filing date. Also, the class representatives have made the claim, which is one of the common issues, that the Defendants have failed in their duty to supply royalty owners with the correct information as to the prices on which royalty payments were made, in violation of Louisiana Revised Statute 31:212.31. In the case of Wegman v. Central Transmission, Inc., 499 So.2d 436 (La.App. 2 Cir.1986), writ denied, 503 So.2d 478 (La.1987), the court held that the defendant could not benefit by its misrepresentations and breaches of contract and was not allowed to take advantage of a situation of its own making, nor claim that the plaintiff acquiesced in the price received when the plaintiff was acting on incomplete information that the defendant had the duty to supply.
Affirmative defenses should be considered in making class certification decisions. Castano v. American Tobacco Co., 84 F.3d 734 (5 Cir.1996). "[S]tatute-of-limitations defenses are appropriate for consideration in the class certification calculus.... [but are not] an automatic disqualifier." Waste Management Holdings, Inc. v. Mowbray, 208 F.3d 288, 295-96 (1 Cir.2000). In that case, the court found that "a common proffer likely would establish the factual predicate necessary for a *1086 tolling determination." Id. at 297. We repeat here the rule of Article 592(A)(3)(c), which states that "[i]n the process of class certification, or at anytime thereafter before a decision on the merits of the common issues, the court may alter, amend, or recall its initial ruling on certification and may enlarge, restrict, or otherwise redefine the constituency of the class or the issues to be maintained in the class action." The potential complication of the defense of prescription is not enough to decertify the class. We conclude that the trial court properly found there were common issues that predominated over individual issues.
Article 591(B)(3) lists six non-exclusive factors, two more than Rule 23, pertinent to predominance and whether a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The additional factors, (e) and (f), are those already recognized by the jurisprudence. For many of the reasons which we have already mentioned, these factors support the trial court's decision.
Factor (a), "[t]he interests of the members of the class in individually controlling the prosecution or defense of separate actions," and factor (b) "[t]he extent and nature of any litigation concerning the controversy already commenced by or against members of the class," both reckon in favor of a class action. The testimony of the class representatives showed there could be no reason why any member of the class would want to or need to conduct a separate suit. None have sued, apparently, as we have not been made aware of any other litigation except the actions filed by the representative plaintiffs. Also, the majority of members' royalty checks have averaged less than $100 a year, and separate suits by these are unlikely for many reasons. The evidence shows the members' interests will be adequately protected by the representative parties.
Factor (c), the desirability or undesirability of concentrating the litigation in the Sixteenth Judicial District Court, was not the subject of any testimony, and we can perceive no basis within our judicial notice perspective to find a problem with this forum. We have already discussed the fourth factor (d), manageability, but will add the observation that complex litigation always creates case management problems. However, the trial court has determined that the benefits of a class action are worth the administrative difficulties, and this is a decision which we believe is well within its discretion to make.
New factor (e) is "[t]he practical ability of individual class members to pursue their claims without class certification." Although this factor is not articulated in Rule 23, it is well-established in federal law and is, likewise, well-established in Louisiana law. See McCastle, 456 So.2d 612. In fact, the most dominant justification for a Rule 23(b)(3) class action is the vindication of the rights of groups of persons with negative value lawsuits. Amchem Products, Inc. v. Windsor, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). This policy is at the very core of the class action mechanism. Id. It is often used as the sole rationale for finding superiority. E.g., In Re Crazy Eddie Securities Litigation, 135 F.R.D. 39 (E.D.N.Y. 1991). As observed earlier, in our present case, there are thousands of royalty owners whose royalties have amounted to less than $100 a year. As a practical matter, none of them would pursue their claims without class certification.
The last factor pertinent to predominance and superiority, new factor (f), makes pertinent consideration of "[t]he extent to which the relief plausibly demanded on behalf of or against the class, including the vindication of such public policies or legal rights as may be implicated, justifies the costs and burdens of class litigation." Management of this case will not suffer from the excessive complications of, for example, a nationwide asbestos certification attempted in Amchem Products, Inc., 521 U.S. 591, 117 S.Ct. 2231, 138 *1087 L.Ed.2d 689. There is a common cause alleged, the establishment of a procedure for pricing involving wholly owned subsidiaries to set the price on which to calculate the royalty owners' shares. We fail to see, also, how class certification dramatically affects the stakes. This is not a mass tort case. All or most of the class will prevail, or all will not prevail. Further, the proof of the claims of even one royalty owner, or a consolidated number of claims of suing royalty owners, will require substantial evidence over a period of time that a pattern of self-dealing was taking place. An isolated instance of apparent underpricing, defensible by market fluctuations and other explanations, will not win the case for an individual, consolidated plaintiffs, or a class. Much more evidence will be required and the economies of time and judicial effort with a class action make more sense.
These six factors help answer whether the intertwined goals of effectuating substantive law, judicial efficiency, and individual fairness can be best served by this or some other procedural device. In this case, the question might better be asked what alternative procedural device is there? Because of the nature of this beast, an individual suit by a single royalty owner would be itself complex litigation, but individual or consolidated suits numbering in the thousands would be unthinkable. We find that a class action is the superior means of litigation. The number of litigants is not unmanageable. It is probable, too, that most members of the proposed class are unaware of their rights and, therefore, unlikely to file suit to protect their rights. The amount recoverable by most is so small, it would be cost prohibitive for individuals to pursue their rights. Efficiency favors one litigation. See In Re Sumitomo Copper Litigation, 194 F.R.D. 480 (S.D.N.Y.2000); Rivera v. Grossinger Autoplex, Inc., 00 C 442, 2000 WL 1280904 (N.D.Ill.2000); Davis, 193 F.R.D. 518.

ASSIGNMENT OF ERROR (D)
Their last assignment of error is that individual written demands were not issued prior to suit as acquired by Louisiana Revised Statute 31:137. We reject this argument. The statute does not require that the notice be given by each and every mineral lessor individually. Lewis, 698 So.2d 1001. It is sufficient if the notice fully and completely notifies the lessee of the demands of the named plaintiffs, as well as the intention of those named plaintiffs to demand royalty payments on behalf of a class of royalty owners. Id.
This very issue was before this court in January 1999, on an application by defendants for writs. We denied writs in an unpublished opinion, and the supreme court denied writs in Duhé v. Texaco, Inc., 98-2843 (La.1/29/99), 736 So.2d 830. We adhere to our previous ruling.
For the foregoing reasons, we find no abuse of discretion in the trial court's ruling and affirm the certification at appellants' costs.
AFFIRMED.
NOTES
[1] Article 591(A) and (B) now read as follows:

A. One or more members of a class may sue or be sued as representative parties on behalf of all, only if:
(1) The class is so numerous that joinder of all members is impracticable.
(2) There are questions of law or fact common to the class.
(3) The claims or defenses of the representative parties are typical of the claims or defenses of the class.
(4) The representative parties will fairly and adequately protect the interests of the class.
(5) The class is or may be defined objectively in terms of ascertainable criteria, such that the court may determine the constituency of the class for purposes of the conclusiveness of any judgment that may be rendered in the case.
B. An action may be maintained as a class action only if all of the prerequisites of Paragraph A of this Article are satisfied, and in addition:
(1) The prosecution of separate actions by or against individual members of the class would create a risk of:
(a) Inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
(b) Adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
(2) The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
(3) The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to these findings include:
(a) The interest of the members of the class in individually controlling the prosecution or defense of separate actions;
(b) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
(c) The desirability or undesirability of concentrating the litigation in the particular forum;
(d) The difficulties likely to be encountered in the management of a class action;
(e) The practical ability of individual class members to pursue their claims without class certification;
(f) The extent to which the relief plausibly demanded on behalf of or against the class, including the vindication of such public policies or legal rights as may be implicated, justifies the costs and burdens of class litigation; or
(4) The parties to a settlement request certification under Subparagraph B(3) for purposes of settlement, even though the requirements of Subparagraph B(3) might not otherwise be met.